Our final case this morning is Ulrey v. Reichhart. Good morning, my name is Teddy Sture and I represent Plaintiff Appellant Lisa Ulrey. May it please the court, Lisa Ulrey was the assistant principal for Manchester Junior Senior High School. She engaged in protected First Amendment speech when she reported the superintendent, Dr. Bill Reichhart, to the board president for impermissibly allowing a student of Squire Academy to bring cigarettes to school. Ms. Ulrey was speaking as a citizen and not as a public employee because she was not expected, as part of her duties, to report the superintendent's misconduct to the board president. The court below erred when it found that because her duties included, among other things, enforcement of student handbook policies for students at Manchester High School, that her report to the board president was a part of her duties and therefore she was speaking as a public employee. The court disregarded the fact that Ms. Ulrey had no administrative responsibility for or authority over Squire Academy. Squire Academy was an alternative school set up by the superintendent, whose administrator, Dory Mobley, was answerable only to the superintendent. With respect to the issue of whether Ms. Ulrey voluntarily resigned, she did not. Dr. Reichhart conned her into believing that because he felt she was not trustworthy, she should resign. Is the key fact in your argument there that her complaint was made to the board president? In other words, suppose that the plaintiff had learned that the teacher in the shop class was handing out cigarettes to the shop students and Ms. Ulrey reacted to that by suspending the students? Ms. Ulrey would have had no authority to suspend the student there in question because she had no authority over Squire Academy students whatsoever. The superintendent had declared that the Squire Academy was separate and apart from the Manchester Junior Senior High School, where Ms. Ulrey served as assistant principal. I thought that Squire Academy, though, was like an affiliate or a related school. No, the only relationship, Your Honor, was that they were physically housed in the same building. However, they had their own chain of command structure. That is, the director, Dory Mobley, reported directly to the superintendent. With respect to the issue of whether Ms. Ulrey voluntarily resigned, she did not. Like I said, Dr. Reichart conned her into believing that she was not trustworthy. The court below applied an invalid syllogism when it concluded that Ms. Ulrey had voluntarily resigned. The court reasoned that when Dr. Reichart asked her to resign, Ms. Ulrey had a genuine choice of saying no. But because she didn't, her resignation was voluntary. The court failed to consider that the so-called choice was a false choice and, therefore, not a real voluntary choice. Simply put, if the chief executive of any organization asks for your resignation, she expects you to tender your resignation. And that is not a voluntary resignation. How does that fit with the statutes providing due process rights to Indiana educators? Well, the link is that Dr. Reichart conned her into resigning so as to avoid— He doesn't—you're right. He doesn't have the right to fire her subject to—be subject to the school board's review, right? Correct, Your Honor. So, we have case law cited by the district court that looks to me squarely on point here and that you did not address in your brief. The Polka case, for example, on the due process issue and the voluntary or involuntary resignation debate. I apologize for the deficiency, Your Honor, but I thought I did address it focusing on the point of whether or not her resignation was truly voluntary. Because if it was not voluntary, then you get to the due process issue. But the question before the district court and before this court is whether or not her resignation was truly voluntary. If it was not, then she was denied due process. If it was, then certainly the Polka case does apply. But the Polka case talked about voluntary resignation, did not address involuntary resignation. Well, in our case law, we've talked about what would—what might make a resignation coerced, a threat of criminal prosecution, for example. Correct. We don't have anything like that here. What we have is a disagreement on policy matters and following the chain of command or not, right? Well, I did not address the question of coercion because we're not arguing that she was, quote, coerced into it. We're simply saying that given all of the circumstances of the resignation, his previous expressed anger toward her, his previous effort to try to reprimand her, his questioning of her license not once, not twice, but three times when, in fact, he didn't question the other two comparators, Matt Carver or Heidi Slavkin, at all about their licensing discrepancies. All of those circumstances could lead a reasonable juror to conclude that, yes, he wanted her to resign, so as to get rid of her, and the motive being that he— Well, that much is apparent, right? That doesn't make a voluntary resignation involuntary, the fact that the supervisor is being heavy-handed. We're not comparing it to voluntary or involuntary, Your Honor. We're simply saying that the— That is the argument you're making, that this is involuntary. It's not an either-or, Your Honor. What we're saying is that it was not voluntary. That means involuntary. That's your argument. Yes, Your Honor. And we've recognized only very limited circumstances under which a resignation would be considered involuntary. There's a permutation that I would argue on that point, Your Honor, and that is it doesn't—it is not a zero-sum game. That is, a resignation that is not voluntary does not necessarily mean involuntary. It could be obtained through deception. It could be obtained through a promise of something else. And given, you know, all the circumstances under which she resigned, we argue that she was basically given a choice of fight or flight. You know, she was a very intimidating meeting atmosphere, and she had previously come under the gun, you know, of Dr. Reichardt. And taking the constellation of the circumstances, I think any reasonable juror could find, you know, that her resignation was not voluntary. And then that begs the question, why? Why was he trying to get her to resign? And that is because, you know, she had told on him to the board president. Is it correct, Mr. Sturey, that the superintendent changed his mind about this possession of cigarettes question? Yes, Your Honor, it is. He did so the very same day that the board president called him out on it. Before or after she called? After she called. I thought, okay, I think the defense was telling us that Ms. Ulrey walked out on the meeting before it was over and called the board president. Yeah, Ms. Ulrey was in the meeting with Ms. Alspaugh and Mr. Hester, who was one of the school counselors. And when she learned, you know, that he had done that, that's when she called the board president. I would like to reserve a couple of minutes for rebuttal. You'll have 49 seconds. Thank you. Ms. Blevins. Good afternoon, Your Honors, and may it please the Court. My name is Sarah Blevins, and I represent athletes, Dr. Reichert, and the School Board of Manchester Community Schools. The district court in this case correctly granted summary judgment in favor of Dr. Reichert and the school board when it held that Ms. Ulrey voluntarily resigned, therefore waiving procedural protections available to her, and that Ms. Ulrey did not engage in protected speech when she spoke in her capacity as a public employee and not as a private citizen. I want to turn first to the First Amendment issue. There were some questions about Squire Academy, and I think that's a very important issue in this case regarding the scope of Ms. Ulrey's responsibilities. To be clear, Squire Academy was a separate program under the school board. It was housed in the same building that had seventh-grade classrooms and the administrative offices. At the time that the relevant events happened, there was a bit of confusion regarding sort of who was responsible for Squire Academy. This was the very first year that it had been open. The incident in question happened on the second or third day of school. It was a very new program. In fact, in the record of Ms. Ulrey's deposition, she acknowledges that at that point it was a good question regarding what the structure was with respect to Squire Academy. Irregardless, even if Ms. Ulrey did not have direct responsibility for students at Squire Academy, what is important here is that the speech that she engaged in was directly related to her role as enforcing the student handbook. And the reason for that is because something that Ms. Ulrey says herself in her affidavit that was submitted in opposition to summary judgment that she said part of the reason she was angry is because it sent a message to students and staff regarding breaking the rules. So it is conceivable to see a situation where other students, other staff understand that there is an exception that's been made to student handbook policy and that can create some sort of chaos in the system and that that may actually have an effect on direct effect on Ms. Ulrey's job responsibilities. So the speech in question was indeed centered on things that were intimately related with her job duties. With respect to whether or not she was reporting misconduct, first of all, there was no misconduct in this case. Dr. Reichert did not violate any school board policies. He actually had specific authorization under school board policy to make discretionary decisions regarding discipline to, quote, help a student. That is exactly what happened here. School board policy did not have any prohibitions against use or possession of tobacco. The school board policy was only about use of tobacco. Where the possession comes in was only in the student handbook. So there was no board policy that was violated. There was no state law that was violated. The student was 18 years old. And the only thing at issue here was the student handbook, which again was something that was in Ms. Ulrey's job description. And for that reason, this was certainly within the scope of her employment. Ms. Clevens, does your position on the First Amendment protection depend upon those disciplinary responsibilities such that some other teacher, a line teacher, who passed the same complaint on to the school board president, could be protected? No, Your Honor. I don't believe that would be the case. And the reason for that is if you look at the case law that talks about whether or not it's in the scope of employment. There have been cases, for example, there was a Northern District of Illinois case where a teacher reported about a fellow teacher that had a criminal history that had previously been unknown by the school. And they said, well, that's not directly within your scope of teaching. However, that isn't within the course and scope of your employment. And you're speaking as an employee at that point. So you sort of look at the broad strokes of what these public employees are to do. And in the cases that talk about police officers, there's a general duty to protect public safety. Well, for school employees, there's a general duty to advance the educational mission of the school and to protect students. So if there is some sort of discretionary decision made by an administrator and someone, another school employee, makes a complaint about that, that is within that scope of what that employee is expected to do in terms of advancing the educational mission of the school and protecting students. How would that apply in, I think, the Connick case from the Supreme Court where the teacher was complaining about the spending priorities of the school board, complaining to their bosses, the people? Correct. And the context, I think, matters a great deal in those kind of cases. Is it a public comment? Is it something like that? I mean, if going to the school board and complaining about budgetary matters, that could potentially be an issue where you are speaking as a private citizen and not as a public employee. But in this case, what we're looking at is a discretionary decision about one particular student, a disciplinary decision for one student. And that is much different than something about broader budgetary matters or something like that, which have much greater public import than a disciplinary situation for one particular student. Something, quite frankly, could not have been disclosed to the public under student privacy laws. That isn't something that the school board could have sat in a public meeting and discussed because, particularly in a smaller community like what we have here, it would have been very easy for people to figure out who this student was if that was discussed in a public forum. Ms. Blevins, I got a question for you. I know you don't think it's the case here, so just take it as hypothetical, okay? Sure. Suppose that the school board did face a credible allegation that somebody was constructively discharged. You know, the situation was just so bad that any reasonable person would have resigned in that circumstance. Is there any, whether in state law or local law, any process that is available to an employee in that situation that, sure, as a matter of fact, they resigned? I mean, they didn't get a letter saying you're terminated. But, you know, anybody in that situation would have resigned, or do they just have to resort to litigation? Well, all employment action is subject to board approval. So, in this case, for example, the resignation did go to the school board. So, although it rarely happens, it is possible for a school board to not accept that resignation if information comes to their attention. Could you go to the school board and say, well, yes, I resigned, but everyone in the world would have resigned in this situation, and I'm asking you, the school board, to reinstate me because here are the circumstances. Yes. And, in fact, in this case, Ms. O'Reilly did go to the school board and asked to be reinstated, and they declined to make any decisions on that. Over the licensing issue? Over the licensing issue, which was a very serious issue and quite separate from the speech issue. I mean, the issues that were involved that led to the resignation raised serious concerns, not only for the school district, but also for the Indiana Department of Education. Is there any evidence that it was pretextual? In other words, that she doesn't hold the qualifications to have it? It's like a tenure administrator's license or something, right? Correct. It's an accomplished practitioner license. Any dispute in the record about whether that's real or not? No, she didn't. No, there's no dispute about that, that she was not qualified for that license. That's not disputed at all. To get that license, she would have had to have 60 graduate credit hours to be qualified for that license, and she admits that she did not have that. And, in fact, she agreed when the Department of Education asked her, you know, do we have permission to correct your license? She consented to that. So that's never been an issue. She, in fact, was never qualified for that license. And so she was employed as an assistant principal for approximately a year under a license that wasn't valid, which raises a lot of serious concerns. I mean, there needs to be a valid administrator's license to do teacher evaluations, to do student expulsions, and to have someone in a position like that that didn't have a valid license to do those things was a serious problem. And it wasn't just the concern of Dr. Reichert. It was the concern of staff counsel at the Indiana Department of Education, too, who in her deposition noted that she had no knowledge of any of the speech issues that had gone on a couple months prior, some 11 weeks prior to all this coming up. So I think the important thing to note in this case is, although there's been a lot of focus, obviously because this is where the district court went, on whether or not Ms. Lurie is speaking as a private citizen or a public employee. Clearly she was speaking as a public employee. But also if you look at all the other elements of retaliation, her claims fail on each and every element. So we would get to causation there. And what evidence is there of causation? Scant evidence, quite frankly. That's the fact that the speech happened before, prior in time. And then there's questions about the comparators. Now, Mr. Sturgeon mentioned that Dr. Reichert had not talked to the comparators. And, in fact, that's not true. The record shows that there were conversations with both Mrs. Slotkin and Mr. Carter about their particular licensing issues. So those conversations did happen. They did not resign. They did not offer their resignations. But those conversations did happen. And those situations were dramatically different. So looking at that, there's no allegation of continuing animus and, in fact, no evidence of that to establish causation in this case. Thank you very much. All right. Thank you. Your Honor, just a couple of rebuttal points. The speech that they relied on, the defendants relied on, I'm sorry, the point that they made about her deposition testimony where she got angry. In paragraph 65 of her affidavit, she explains other reasons why she was angry. And we would argue that the five-year versus ten-year licensing issue, that is in dispute because that particular entry was on her license at the time that Dr. Reichart had asked her to serve as assistant principal. It was only after she reported his conduct to the board that it became an issue for him that he took action on. So he trusted her, you know, before she reported to the board, but it was only after she reported to the board president that he said, I don't trust you. Thank you. Thank you. Our thanks to both counsel. The case is taken under advisement, and that concludes today's calendar. Court is in recess until tomorrow.